## AFFIDAVIT IN SUPPORT OF APPLICATION FOR SEARCH WARRANT

I, Shane W. Larkin, being duly sworn, depose and states as follows:

## AGENT BACKGROUND

1.      I am a Trooper with the New Hampshire State Police (NHSP) and I have served

in this capacity since August 2, 2002.  Since April 2013, I have been assigned to the NHSP

Narcotics and Investigation Unit ("NIU") and the Federal Bureau of Investigation (FBI) Safe

Streets Gang Task Force ("SSGTF").   I have attended narcotics and criminal investigation

training classes put on by the NHSP, the FBI, and the New Hampshire Police Standards and

Training Council.

2.      Over the course of my career, I have conducted approximately one hundred

investigations into unlawful drug trafficking, including violations of Title 21, United States

Code, Sections 841(a)(1).  As a result, I have conducted, or participated in, the following

investigative techniques: physical and electronic surveillance; controlled purchases of narcotics;

execution of search warrants; debriefings of cooperating sources and defendants; reviews of

taped conversations; and analysis of records related to drug trafficking.  Through my education,

training and experience, I am familiar with the methods used by drug traffickers to transport,

store, conceal and distribute illegal drugs and their proceeds.  In connection with drug-trafficking

investigations, I have conducted follow-up investigations into the concealment of money and

other assets, including review of bank and other financial records.  Furthermore, in other drug-

trafficking investigations, I have identified co-conspirators through review of drug trafficking ledgers, telephone bills and records, photographs, and financial records.

3.     I have also participated in investigations involving court-authorized interception of wire and electronic communications.  Based on these prior investigations, I am familiar with the ways in which drug traffickers conduct their business, including, but not limited to, their methods of importing and distributing drugs, their use of cellular telephones, and their use of numerical codes and code words to conduct their transactions.

## PURPOSE OF AFFIDAVIT

4.     The FBI is currently conducting an investigation into drug trafficking activities of **THOMAS A. DEWARE** in the District of New Hampshire.  Based on my training and experience and the facts as set forth in this affidavit, I believes that **DEWARE** has committed, is committing, and will continue to commit offenses involving distribution and possession with intent to distribute controlled substances, in violation of Title 21, United States Code, Section 841(a)(1).

5.     This affidavit is submitted in support of an application for a warrant to search various premises used by **DEWARE** in furtherance of his drug-trafficking operations and to seize evidence of drug trafficking as described in **Attachment B**.  Specifically, this affidavit is being submitted in support of a search warrant for the following premises located on **Deware Drive, Belmont, New Hampshire 03220**:

a)  A white singlewide aluminum-sided mobile home located at 37 Deware Drive, Belmont, New Hampshire (hereinafter "**Subject Premises A**"), as further described below and in **Attachment A**; and

b)  An off-white camper trailer with brown stripe located in the northwest corner of the property at Deware Drive, Belmont, New Hampshire (hereinafter "**Subject Premises B**"), as further described below and in **Attachment A.**

6.  I make this affidavit based upon my personal knowledge derived from my participation in this investigation and upon information from the following sources, which I believe to be reliable:

a)  My training and experience investigating drug-trafficking offenses;

b)  Oral and written reports, and documents about this and related investigations that I have received from members of the FBI and the SSGTF;

c)  Statements of a confidential source;

d)  Controlled purchases of narcotics;

e)  Physical surveillance conducted by members of the FBI and the SSGTF, the results of which have been reported to me either directly or indirectly; and

f)  Law enforcement and public databases.

7.  The purpose of this affidavit is limited to showing that probable cause exists to support the issuance of a search warrant.  Accordingly, while this affidavit contains all the material information I am aware of that is pertinent to the requested search warrant, it does not include each and every fact known by me or other investigators concerning the investigation.

## CONFIDENTIAL SOURCE AND RELIABLITY OF INFORMATION

8.      Information relevant to this investigation has been provided to the FBI by a confidential source (hereinafter "CS") who has provided information to the FBI since May 2019, which information has been proven reliable and resulted in six drug seizures.

9.      CS's cooperation with law enforcement in this investigation is based upon consideration in a pending state court matter in which CS was charged with receiving stolen property.  At the time of CS's active cooperation in this investigation, CS had a criminal history that consisted of eight prior arrests.  CS has several convictions for misdemeanor offenses, including for conduct after an accident, willful concealment, disobeying an officer, driving after revocation or suspension, receiving stolen Property.

10.     To the extent possible, historical information provided by CS in the instant investigation has been corroborated by independent investigative means, including, but not limited to, review of police reports as well as public and law enforcement databases.  CS has readily admitted to CS's own participation in criminal activity, including the possession and distribution of controlled substances.  Moreover, I believe the controlled purchases conducted by CS described below were conducted in a controlled manner and every necessary precaution was taken to maintain the integrity of the evidence.  In addition, I have reviewed video and audio recordings for each controlled purchase conducted during this investigation.  In my opinion, the recordings are consistent with the CS's description of the events.  For these reasons, I believe the information provided by CS, as set forth below, is credible and reliable.

11.     According to CS, CS has known **DEWARE** for approximately four years and they have a drug-only relationship.  In those four years, CS has purchased methamphetamine from **DEWARE** on multiple occasions.  These prior drug transactions have all taken place at

4

**Subject Premises A**.  In addition to the methamphetamine purchased by CS, CS has personal knowledge that **DEWARE** traffics in cocaine and cocaine base as well.

## DEWARE DRIVE PROPERTIES IN BELMONT, NH

12.      From the Belmont Police Department and the Town of Belmont, New Hampshire, I learned that **Subject Premises A** and **Subject Premises B** are located on a parcel of land owned by Leona J. Deware and Thomas A. Deware.  Based on information gained through this and a related investigation, I know that various members of the Deware family reside in separate residential structures on this parcel of land.  The photograph below shows the boundaries of the Deware Drive parcel, which is demarcated within the orange line:



13.     According to CS, which I have independently corroborated through this investigation, **DEWARE** resides at **Subject Premises A**, a white singlewide aluminum-sided mobile home.  An aerial view of **Subject Premises A** and other structures within the curtilage is depicted below:



14.     As detailed below, this investigation has identified **Subject Premises B**, an off-white camper trailer with a brown stripe, located in the northwest corner of the parcel at Deware Drive, as another location used by **DEWARE** in furtherance of his drug-trafficking activities.  An aerial overview showing **Subject Premises A** and **Subject Premises B** is included below:



**Subject Premises B**, an off-white camper trailer with brown stripe, is located in the northeast corner of the parcel at Deware Drive.

**Subject Premises A**, a white singlewide aluminum-sided mobile home, is located at 37 Deware Drive.

## PROBABLE CAUSE

15.     In the instant investigation, from June 5, 2019, through September 10, 2019, CS made four controlled purchases of narcotics from **DEWARE**.  For each of the below-described controlled purchases, CS and CS's vehicle were searched by agents before and after each operation and no contraband was discovered.  For each controlled purchase, CS was equipped with audio and video surveillance equipment and agents maintained surveillance of CS.  In addition, the audio and video surveillance equipment allowed agents to monitor the CS in real time.  At the completion of each controlled purchase discussed below, CS surrendered the drugs purchased to agents at a pre-determined location, and agents conducted field tests to obtain presumptive results.

16.     The FBI has sent the drugs for laboratory confirmation.  At the time of the submission of this affidavit, only the chemical analysis for the June 5, 2019, controlled purchase has been completed, while the remaining analysis results are still pending.

17.     According to CS, **DEWARE** does not use the telephone to conduct his drug-trafficking business.  CS advised that **DEWARE** generally maintains a supply of drugs.  In order to purchase drugs, CS must travel directly to **DEWARE's** location, specifically **Subject Premises A**.  For this reason, there were no consensually recorded or monitored telephone calls between the CS and **DEWARE** made during the instant investigation.

## Controlled Purchase on June 5, 2019

18.     On June 5, 2019, I provided $360 in U.S. currency to CS and directed CS to meet with **DEWARE** to purchase 7 grams of methamphetamine.  CS traveled by car to **Subject Premises A**.  When CS arrived at **Subject Premises A**, CS and **DEWARE** walked outside and then into a tool shed located next to **Subject Premises A**.  While inside the tool shed, **DEWARE** asked CS what CS wanted and CS replied, "2 eight balls [7 grams]" of methamphetamine. **DEWARE** then removed drugs from his black pouch that he was wearing across his body and handed the drugs to CS.  In return for the drugs, CS provided $360 to **DEWARE**, who placed the money back in his black pouch.  After this transaction, CS asked whether **DEWARE** would be able to sell a larger quantity of methamphetamine, specifically a quarter ounce, the next time. **DEWARE** responded that he should be able to sell CS a larger quantity and would charge $900 for an ounce.  CS then left **Subject Premises A** and returned to meet with agents.

19.     At the predetermined location, CS surrendered the audio/video recording equipment and the drugs.  TFO Derek Feather and I conducted a field test of the drugs obtained from **DEWARE**.  The field test showed a presumptive positive for methamphetamine.

20.     The drugs obtained from **DEWARE** on June 5, 2019, were submitted to the DEA

Northeast Laboratory for chemical analysis.  Chemical analysis revealed that the drugs sold to

the CS was d-methamphetamine hydrochloride, with a net weight of 6.7 grams and purity of

98% +/- 6%.

### Controlled Purchase on July 26, 2019

21.     On July 26, 2019, I provided $800 in U.S. currency to CS and directed CS to meet

with **DEWARE** to purchase half ounce (14 grams) of methamphetamine.  CS traveled by car to

**Subject Premises A**.  When CS arrived at **Subject Premises A**, CS saw **DEWARE** outside on

his tractor.  CS asked **DEWARE** for "four of the ice or chicken."  According to CS, **DEWARE**

uses the term "chicken" to refer to methamphetamine.  In my experience, "ice" is a common

slang term for methamphetamine.  After **DEWARE** step off the tractor, **DEWARE** and CS went

inside **Subject Premises A** and down into the basement where **DEWARE** took out a scale,

removed a quantity of drugs from his black pouch that he was wearing across his body, and

began weighing out the drugs.  Because there was insufficient drugs in the black pouch,

**DEWARE** retrieved additional drugs from a safe in the basement.  **DEWARE** then gave the

drugs to CS.   **DEWARE** charged CS $500 for the half ounce (14 grams) of methamphetamine.

CS paid $500 to **DEWARE**, who placed the money in his black pouch.  CS then left **Subject**

**Premises A** and returned to meet with agents.

22.     At the predetermined location, CS surrendered the audio/video recording

equipment, the extra $300, and the drugs.  FBI Special Agent Paul Mullen and I conducted a

field test of the drugs obtained from **DEWARE**.  The field test showed a presumptive positive

for methamphetamine.

**Controlled Purchase on September 5, 2019**

23.     On September 5, 2019, I provided $1000 in U.S. currency to CS and directed CS

to meet with **DEWARE** to purchase 1 ounce (28 grams) of methamphetamine.  CS traveled by

car to **Subject Premises A**.  When CS arrived at **Subject Premises A**, CS spoke with an

unidentified female, who advised that **DEWARE** was in the "pit" portion of the property,

located in the northwest corner of the parcel at Deware Drive, where he pushes dirt around on his

tractor.  CS then traveled to the "pit" to meet with **DEWARE**, who was accompanied by an

unknown white male.  Upon CS's arrival at the "pit", CS joined **DEWARE** and the unknown

white male inside **Subject Premises B**, an off-white camper trailer with a brown stripe.

**DEWARE** offered crack cocaine to CS to smoke.  CS declined **DEWARE's** offer and stated CS

is not using.  CS advised **DEWARE** that CS had $1000 to purchase an ounce (28 grams) of

methamphetamine.  **DEWARE** retrieved a clear plastic baggy of methamphetamine from a

location just inside the front door of **Subject Premises B** and provided the drugs to CS.  CS paid

$1000 to **DEWARE**.  CS then left **Subject Premises B** and returned to meet with agents.

24.     At the predetermined location, CS surrendered the audio/video recording

equipment and the drugs.  SA Mullen and I conducted a field test of the drugs obtained from

**DEWARE**.  The field test showed a presumptive positive for methamphetamine.

**Controlled Purchase on September 10, 2019**

25.     On September 10, 2019, I provided $1500 in U.S. currency to CS and directed CS

to meet with **DEWARE** to purchase 1 ounce (28 grams) of methamphetamine.  CS traveled by

car to **Subject Premises A**.  When CS arrived at the **Subject Premises**, CS met with **DEWARE**

in the basement.  **DEWARE** appeared to be smoking cocaine or cocaine base.  CS told

**DEWARE** that CS had $500 to pay off a previous drug debt owed by one of CS's associates and

an additional $1000 for an ounce of methamphetamine.  CS provided a total of $1500 to

**DEWARE**.  **DEWARE** removed drugs stored in an area of the basement near toolboxes.  As

**DEWARE** prepared the drugs for their transaction, CS noticed that **DEWARE** had at least three

additional ounces of methamphetamine in his possession.  **DEWARE** provided 2 clear plastic

baggies containing methamphetamine to CS.  Following the transaction, CS exited the basement

and left **Subject Premises A** to meet with agents.

26.     At the predetermined location, CS surrendered the audio/video recording

equipment and the drugs.  TFO Feather and I conducted a field test of the drugs obtained from

**DEWARE**.  The field test showed a presumptive positive for methamphetamine.

## CHARACTERISTICS OF DRUG TRAFFICKING

27.     Based on my training and experience, I have learned that individuals involved in

narcotics activity employ a number of sophisticated techniques, either singly or in combination,

to further their business, or to avoid detection by law enforcement.  I know that drug traffickers

often maintain records, ledger books, receipts, drug customer lists, notes and other papers

relating to importation, transportation, purchasing and distribution of illegal drugs and the

proceeds derived from the sale of controlled substances.  Such documentation may be in code.

The aforementioned records, ledger books, receipts, drug customer lists, notes and other papers

are commonly maintained where the drug traffickers have ready access to them, such as on their persons, or in their homes, businesses or vehicles.  These individuals also commonly maintain books, papers and/or electronic records, which reflect addresses or telephone numbers for their associates in the drug-trafficking organization, and such items may be in code.  Moreover, drug dealers often take, or cause to be taken, photographs of themselves, their associates, their properties, or their products, and usually maintain these photographs in their residences.  In addition, drug traffickers usually keep paraphernalia for weighing, packaging and distributing drugs.

28.     It is common practice for drug dealers to secrete contraband, proceeds of drug sales, and records of drug transactions in secure locations within their residences and outbuildings adjoining their property, stash houses, and/or places of business, for easy access and to conceal such items from law enforcement authorities.  Persons involved in drug trafficking have, in the past, concealed in their residences, stash houses, and/or places of business, caches of illegal drugs, currency, jewelry, automobile titles, firearms and other items of value that are the proceeds of illegal drug transactions in order to protect such assets from law enforcement seizure and/or theft by other criminals. Additionally, documents often exist in these places that contain evidence of financial transactions relating to obtaining, transferring, secreting, or engaging in the trafficking of illegal drugs.  Drug traffickers often maintain documents indicating travel in interstate and/or foreign commerce, such as travel itineraries, plane tickets, boarding passes,

motel and hotel receipts, passports and visas, credit cards receipts, and bills that are related to

their drug trafficking activities, such as for safety deposit boxes, offshore bank accounts or

telephone bills.

29.     It is common for drug traffickers to generate substantial profits as a result of

illegal drug dealing.  These persons often maintain large amounts of U.S. currency in order to

operate and finance their ongoing drug distribution enterprise.  Based on training and experience,

your affiant knows that drug dealers typically do not use banks or bank accounts to store and

transfer drug proceeds due to the risk of law enforcement detection.  Simply put, many drug

traffickers know banks have reporting requirements for large cash transactions and transactions

involving the movement of large sums of money from one account to another.  However, when

drug traffickers amass large proceeds from the sale of drugs, they may attempt to legitimize these

profits by utilizing banks, and their attendant services, securities, cashier's checks, money drafts,

letters of credit, brokerage houses, real estate, and business fronts, among other things.

Moreover, drug traffickers often rely upon third-party nominees to assist in the concealment of

drug proceeds through legitimate bank accounts, loans, leases, etc., to launder money into

commerce without drawing law enforcement attention.  For example, I know that drug proceeds

are often comingled with legitimate funds in bank accounts or used as collateral in loans held in

the names of third-party nominees.  Family members, lower-level co-conspirators, spouses and

paramours are often used to assist in this concealment activity.  Because these individuals do not

13

necessarily sell drugs themselves, they may not feel the need to hide or destroy documents that are evidence of crimes, including money laundering of drug proceeds. Indeed, documents related to the concealment of drug proceeds are often found in the homes and businesses of the true owners and/or third-party nominees months after they are acquired and are useful to agents in establishing the amounts of money earned or spent by drug traffickers.

30.     At their residences and/or other safe locations, drug traffickers often possess firearms, including, but not limited to, handguns, pistols, revolvers, rifles, shotguns, machine guns and other weapons, to protect and secure a drug trafficker's property from law enforcement seizure and/or theft by other criminals. Such property may include, but is not limited to, narcotics, jewelry, narcotics paraphernalia, books, records and U.S. currency.

## **CONCLUSION**

31.     Based on the facts set forth in this affidavit, as well as my training and experience, I believe there is probable cause to believe that **DEWARE** has committed, is committing, and will continue to commit offenses involving distribution and possession with intent to distribute controlled substances, in violation of Title 21, United States Code, Section 841(a)(1). Based on the above-detailed controlled purchases, I believe that **DEWARE** uses **Subject Premises A** and **Subject Premises B**, as described further in Attachment A, to store,

package and/or distribute controlled substances and maintain other, non-drug evidence of his

criminal activities.  Accordingly, I respectfully request that search warrant be issued.


/s/ Shane Larkin
Shane Larkin
Task Force Officer, FBI



Sworn to and subscribed before me on this ___15___th day of October, 2019.



Judge Andrea K. Johnstone
United States Magistrate Judge

## <u>ATTACHMENT A</u>

### Properties to Be Searched

**Subject Premises A**, located at 37 Deware Drive, Belmont, New Hampshire, 03220, is a white singlewide aluminum-sided mobile home, including the curtilage and all other structures within the curtilage, including, but not limited to, the shed adjacent to the mobile home. An aerial view of **Subject Premises A** is depicted below:



**Subject Premises B**, located in the northwest corner of Deware Drive in Belmont, New

Hampshire, is an off-white camper trailer with a brown stripe.  An aerial overview showing

**Subject Premises A** and **Subject Premises B** is included below:



**Subject Premises B**, an off-white camper trailer with brown stripe, is located in northwest area of the parcel at Deware Drive, Belmont, NH.

**Subject Premises A**, a white singlewide aluminum-sided mobile home and its adjoining structures, is located at 37 Deware Drive.

2

**ATTACHMENT B**
ITEMS TO BE SEARCHED AND SEIZED

1.      Controlled substances, including, but not limited to, methamphetamine and any other illicit controlled substances;

2.      Paraphernalia used and commonly associated with the possession and/or distribution of controlled substances, including, but not limited to, scales, packaging materials (e.g., plastic baggies, plastic or glass vials, heat sealing machines), pipes, and materials used for "cutting" or diluting controlled substances;

3.      Any records of past, present or future drug transactions, including ledgers or logs containing information about other drug dealers, customers and/or transactions;

4.      Significant sums of U.S. Currency;

5.      Firearms; and

6.      Personal effects or documents tending to establish property interest in the **Subject Premises**, including, but not limited to, personal identification, driver's license, passports, vehicle registration certificates, birth certificates, deeds, bills, correspondence, utility bills, and canceled envelopes.